555 F.2d 398
 10 ERC 1792, 7 Envtl. L. Rep. 20,359
 COALITION FOR RESPONSIBLE REGIONAL DEVELOPMENT and Ruth C.
Sullivan, Appellants,
v.
William T. COLEMAN, Secretary of Transportation, United
States of America, and William S. Ritchie, Jr.,
Commissioner, Department of Highways,
State of West Virginia, Appellees.
 No. 76-1400.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 11, 1977.
Decided April 11, 1977.
 
 Ray E. Ratliff, Jr., Charleston, W.Va. (Kaufman & Ratliff, Charleston, W.Va., on brief), for appellants.
 Ann Almy, Asst. U. S. Atty., Washington, D.C., Anthony G. Halkias, West Virginia Dept. of Highways, Charleston, W.Va. (Peter R. Taft, Asst. Atty. Gen., Washington D.C., John A. Field, III, U. S. Atty., Charleston, W.Va., Ray L. Hampton, II, Asst. U. S. Atty., Huntington, W.Va., Edmund B. Clark and Kathryn A. Oberly, Attys., Dept. of Justice, Washington, D.C., on brief), for appellees.
 Before RUSSELL and WIDENER, Circuit Judges, and WYZANSKI, Senior District Judge.*
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 This suit to enjoin the construction of a bridge across the Ohio and Guyandotte Rivers between Huntington, West Virginia and Proctorville, Ohio, was earlier before this Court on appeal from an order denying a preliminary injunction.[1] The factual background for the proceedings is adequately stated in the opinion reversing the District Court's denial of such injunction and need not be restated here. The action is now before us on appeal from a decree of the District Court on the merits, denying an injunction and dismissing the action. We affirm.
 
 
 2
 The bridge involved in this proceeding is to be entirely state-financed. It, however, would cross a navigable stream. Permission to cross such a stream depends on the issuance of a federal permit under the provisions of the General Bridge Act.[2] Before issuing such a permit, the Secretary must prepare an environmental impact statement (EIS) in compliance with the National Environmental Policy Act;[3] and, since the construction would constitute a use of "parklands" the Secretary has to make the determinations mandated by § 4(f), Department of Transportation Act,[4] and to comply with the provisions of § 106 of the National Historic Preservation Act.[5] The Secretary prepared an EIS, and made the necessary findings under § 4(f) and § 106. The plaintiffs, attacking the legal validity and sufficiency of the Secretary's determinations, instituted this action to enjoin the construction of a bridge. After a trial, the District Court, in a carefully reasoned opinion, entered its order from which this appeal by the plaintiffs is taken.
 
 
 3
 It is necessary, as a predicate to a review of the District Court's order, that we mark out the scope of judicial review in cases such as this one. The standard for judicial review of an administrative decision under either NEPA or § 4(f) of the Transportation Act is declared in Citizens to Preserve Overton Park v. Volpe (1971), 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136. As there declared, the court is to consider first, "whether the Secretary acted within the scope of his authority" and, second, whether the ultimate decision was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "[6] In applying the arbitrary standard, the court must "engage in a substantial inquiry"[7] in order to determine whether the agency, in its conclusions, made a good faith judgment, after considering all relevant factors, including possible alternative or mitigative measures.[8] In passing on such "good faith" administrative judgment, the court specifically is "not empowered to substitute its judgment for that of the agency."[9] Environmental Def. F., Inc. v. Corps. of Eng. of U. S. Army (5th Cir. 1974), 492 F.2d 1123, 1139; Sierra Club v. Froehlke (7th Cir. 1973), 486 F.2d 946, 953. To quote an authoritative commentator, the court is "not (to) make the ultimate decision" but only to see "that the official or agency take a 'hard look' at all relevant factors."[10] This is so because the power of judicial review in this area, is a narrow one to be applied within reason,[11] and in essence is confined to a determination of whether the administrative decision "represented a clear error of judgment."[12] In making such determination, the court is not to be led into construing the mandating statutes as a device to be used as "a crutch for chronic faultfinding" and, it is not to fault an agency for failure to consider "an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative."[13] Nor is the agency obligated "to consider in detail each and every conceivable variation of the alternatives stated;" it " 'need only set forth those alternatives "sufficient(ly) to permit a reasoned choice'. "[14] In sum, so long as the court, in its review, observes the rule of reason and practicality and takes a "hard look" at the relevant factors, it performs its obligation under the statutes.[15]
 
 
 4
 The plaintiffs do not argue that the Secretary, in his determination under NEPA or § 4(f), acted beyond the scope of his authority. Their argument is primarily directed to the District Court's determination that the Secretary adequately considered and evaluated the Lewis Hollow site as a "feasible and prudent" alternative. They contend that both the Secretary and the District Court dismissed the Lewis Hollow site for an erroneous reason and without a proper consideration of factors relevant to its feasibility. In the exposition of their argument that these determinations rested on an erroneous premise, the plaintiffs hark back to their contentions addressed in our earlier appeal and assert that the determination by the District Court was based, despite our direction in the earlier opinion, on the premise that the bond authorization statute, by its alleged geographic limitation, eliminated the Lewis Hollow site as a feasible and prudent alternative. We, however, find nothing in the opinion of the District Court to support this contention. Nowhere in its opinion does the District Court refer to the bond authorization statute in support of its decision. It spelt out clearly the reasons which prompted its conclusion against the Lewis Hollow site as a viable alternative. It found that the Lewis Hollow site "would create 4(f) problems in that such a location would involve the taking of either a public fairground, a public school playground or a golf course," would lie "outside of the general traffic corridor encompassed by this particular project" and would "not accomplish the objectives of the (proposed) project". All the reasons so identified represented valid reasons for finding the Lewis Hollow site not to be a viable alternative. They were reasons for which there was clear support in the record. None of them finds its justification in the bond authorization statute. In resting its conclusions on such reasons the District Court conformed scrupulously to our ruling in the earlier decision and to the proper criteria governing judicial review.
 
 
 5
 It is equally clear that the Secretary did not predicate his determination against the Lewis Hollow site on the bond authorization statute. This the District Court expressly found, declaring that the Secretary's decision was made "without regard to the bond resolution." Again, this finding is amply supported in the record. In the EIS, it is stated:
 
 
 6
 The Second Coast Guard District Legal Officer has expressed the opinion that he finds no prohibition against other site locations and, further, that the applicant's reliance on the case of State ex rel. Nelson vs. Ritchie (154 W.Va. 644, 177 S.E.2d 791 (W.Va.1970)) to both preclude Lewis Hollow as an alternate location and to build only within an area between 24th Street and 31st Street is unsupportable.
 
 
 7
 This language is not substantially different from our own language in our earlier opinion.[16] It makes manifest that the Secretary's determination is no more based on the limitations of the bond statute than was our earlier opinion. On the contrary, the Secretary rested his decision against the Lewis Hollow site on the finding that it "would not provide for the State's orderly planned program for alleviating traffic congestion at existing bridge crossings in Huntington and related city streets with attendant adverse impacts as they now exist." This conclusion was developed in greater detail in the final EIS itself, where it is stated:
 
 
 8
 Under this alternative (Lewis Hollow), 90% of all cross river vehicular traffic in the Huntington area that origin and destination studies showed originated within a 3 mile radius of the 6th Street bridge, would be faced with an average increase in round trip mileage of approximately 10 to 12 miles. Further, these studies showed that the projected level of traffic that would use a bridge at Lewis Hollow would not comprise a significant percentage of vehicles presently using the already overburdened existing 6th and 17th Street structures, nor generate sufficient revenue from tolls to successfully finance the project. It is likely that the motoring public would rather face the congestion at the existing crossings to avoid subjecting themselves to the increased distance and cost, related inconvenience and adverse traveling safety aspects that would be associated with the additional mileage involved under this alternative.[17]The establishment of an entirely new traffic corridor that would result from locating a highway and bridge facility at the Lewis Hollow site and related environmental impacts that would likely accrue to what may now be considered an open area relatively untouched and unspoiled by vehicular pollution and land usage changes commonly associated with highway development on new location would be avoided for the present by building the proposed bridge at the Guyandotte site.[18]
 
 
 9
 These reasons were further elaborated in the trial testimony of the State Highway Engineer, who testified to certain design studies submitted to the Secretary and admitted in evidence at trial. These studies indicated that in order to relieve § 4(f) problems inherent in any Lewis Hollow use as a bridge site, a sharp curve or jog would have to be a part of the bridge design. Such a curve or jog would manifestly create, as the Engineer explained, a serious hazard to the users of such bridge. It is thus clear, as the District Court found, that in the final EIS the Secretary based his finding, not on the bond authorization statute, but on a consideration of the actual feasibility of the Lewis Hollow site as an alternative site.
 
 
 10
 The plaintiffs' other claim of error in the conclusions reached by the Secretary and approved by the District Court is that the former did not give proper consideration to an inter-regional highway belt-line around Huntington, with a bridge at Lewis Hollow as an integral part, by way of a " feasible and prudent alternative." They argue that such failure invalidates the Secretary's action. There is nothing in the record, however, to show that the West Virginia Highway Department, which is the only public agency with legal authority to develop a proposal for a belt highway, had ever formulated any proposal for such a belt highway, much less had ever considered that such a beltway would serve the purposes of the proposed bridge. In fact, the Secretary made an express finding that the Lewis Hollow site would not meet the needs of an inter-city bridge, which was the purpose of the proposed bridge and this finding is supported in the record. In the absence of an active, as distinguished from a purely speculative, proposal from a responsible public agency, with power and responsibility in the area, it was held in Kleppe v. Sierra Club (1976), 427 U.S. 390, 401, 96 S.Ct. 2718, 2727, 49 L.Ed.2d 576 (decided 1976), that "there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement."[19] The mere fact that a City of Huntington committee, which lacked any legal authority in the premise, had in the early 60's proposed a belt highway about the City a proposal that apparently was not considered by the State Highway Department or even the Department of Transportation will not render such a plan deserving of an impact statement.
 
 
 11
 Under § 4(f), it is necessary to show not merely that there is no feasible and prudent alternative to the encroachment on a park but that every possible effort has been made to "minimize harm to" the park. The plaintiffs do not seem to argue that this requirement was not complied with under the proposal approved by the Secretary. Nor, as the District Court makes manifest in its opinion, could it be seriously contended to the contrary. The defendants, in their plans, have elevated the bridge's approach over the park some forty-five feet so as to leave undisturbed in any substantial degree any part of the park. It is true that the bridge piers of the elevated bridge would eliminate three parking spaces in the park but the defendants were replacing those spaces with an equal space on contiguous property acquired by the defendants for that purpose.[20] No party has suggested anything else the defendants could do in order to minimize further the intrusion by the proposed bridge on the park.
 
 
 12
 Finally, the plaintiffs suggest that the Maddie Carroll House qualifies as an historic site under the National Historic Preservation Act and under section 4(f) of the Department of Transportation Act. The Secretary, however, found that construction at the 31st Street site would have no effect on this historical house. The Advisory Council on Historic Preservation acquiesced in this determination. The District Court confirmed this determination and we find no error in such action.
 
 
 13
 The decree of the District Court which denied the plaintiffs injunctive relief and dismissed the action is accordingly
 
 
 14
 AFFIRMED.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 Coalition for Responsible Reg. Develop. v. Brinegar (CA 4 1975), 518 F.2d 522
 
 
 [2]
 33 U.S.C. § 491, et seq
 
 
 [3]
 42 U.S.C. § 4321, et seq
 
 
 [4]
 49 U.S.C. § 1653(f)
 
 
 [5]
 16 U.S.C. § 470f
 
 
 [6]
 401 U.S. at 415, 416, 91 S.Ct. at 823
 Note, Program Environmental Impact Statements: Review and Remedies, 75 Mich.L.Rev. 107, 128-9.
 The ruling in Overton Park has been summarized thus:
 "Although the Secretary was not required by the highway statute to make findings and was not subject to a judicial review to determine whether his decision was supported by 'substantial evidence,' the Supreme Court held that the district court 'must conduct a substantial inquiry.' After reciting the maxim that his action is entitled to a presumption of regularity, the Court cautioned: 'that presumption is not to shield his action from a thorough, probing, in-depth review.' The court must give 'scrutiny' to the facts to see whether the Department acted within the reasonable range of its authority, and must go further to see whether there was an abuse of discretion. 'To make this finding the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " Leventhal, Environmental Decision Making, 122 U. of Pa.L.Rev. 509, 513.
 
 
 [7]
 401 U.S. at 415, 91 S.Ct. 814
 
 
 [8]
 Ely v. Velde (4th Cir. 1971), 451 F.2d 1130, 1138
 
 
 [9]
 401 U.S. at 415, 416, 91 S.Ct. at 823
 
 
 [10]
 122 U. of Pa.L.Rev. at 514
 
 
 [11]
 Natural Resources Defense Council, Inc. v. Morton (1972), 148 U.S.App.D.C. 5, 458 F.2d 827, 832
 
 
 [12]
 Environmental Defense Fund v. Corps of Eng., U. S. Army (8th Cir. 1972), 470 F.2d 289, 300, cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973)
 
 
 [13]
 Life of the Land v. Brinegar (9th Cir. 1973), 485 F.2d 460, 472, cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974)
 
 
 [14]
 Brooks v. Coleman (9th Cir. 1975), 518 F.2d 17, 19
 
 
 [15]
 Environmental Defense Fund v. Tennessee Valley Auth. (6th Cir. 1974), 492 F.2d 466, 468, n. 1
 
 
 [16]
 518 F.2d at 526, n. 3. Our language was:
 "Whether the proceeds of bonds issued and sold under a resolution limiting their use to a 'bridge in the vicinity of 24th Street to 31st Street * * *' may properly be applied to the construction of a bridge 2.2 miles east of 31st Street is at least arguable, and has not been authoritatively determined under state law."
 
 
 [17]
 The plaintiffs object to the Secretary's findings on the relative relief of the traffic congestion which would be provided by the 31st Street bridge as contrasted with Lewis Hollow bridge. They press the point that the Secretary should have secured later compilations and that such later compilations would have been more favorable to the Lewis Hollow site. This is much the argument made in City of Romulus v. County of Wayne (E.D.Mich.1975), 392 F.Supp. 578, 587. In that case, the Court branded such an argument as "hypercritical." For a discussion of this case, see 75 Mich.L.Rev. at 130
 
 
 [18]
 This evidence was offered at trial. The plaintiffs now contend that it should not have been received. The plaintiffs, however, did not object to its introduction; they only requested the right to delay cross-examination on this testimony. That right was granted
 
 
 [19]
 This decision was thus summarized in 75 Mich.L.Rev. at 116:
 "The Court concluded that NEPA required impact statements only for actions that are actually proposed by the agency and not merely contemplated."
 In Natural Resources Defense Council, Inc. v. Morton, supra, at 838, the District Court had earlier held that there was no need to discuss effects (or alternatives) "deemed only remote and speculative." This idea was later summarized by Judge Leventhal in his article in 122 U. of Pa.L.Rev. at 525 as holding that the agency is only obligated to discuss and consider " 'reasonably available' alternatives."
 
 
 [20]
 The park involved consists of little more than 10 acres, two-thirds of which was used for parking. The area over which the bridge would run was used for parking. Elevated as the highway was, it would not interfere with parking in the park, except for the three spaces, for which the defendants were substituting an equal number of spaces in an adjacent area